IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>       Plaintiff, )<br>)<br>vs. )<br>)<br>**NATHANIEL DONALD JOHNSON**, )<br>)<br>       Defendant. ) | CRIMINAL NO. 18-220 JB |

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

       The United States of America respectfully submits this response to the Defendant's Motion to Suppress Evidence (Doc. 31). The defendant contends that he did not voluntarily consent to a search of his bag because he was coerced by the Drug Enforcement Administration (DEA) agents. As explained further below, the defendant's motion should be denied because the entire encounter was voluntary and the DEA agents did not search his bag.

**FACTS**

       On January 5, 2018, DEA Special Agent (SA) Jarrell W. Perry and DEA Task Force Officer (TFO) Seth Chavez were at the Greyhound Bus Station in Albuquerque, New Mexico conducting narcotics interdiction operations on the eastbound Greyhound bus during its normal layover in Albuquerque. As passengers began to board the bus, SA Perry began talking to some of the passengers towards the rear of the bus. Prior to speaking to

1

the defendant,[1] SA Perry was talking to a woman seated near the seat that the defendant would soon occupy. SA Perry introduced himself, checked her ticket, got consent to search her bag, and searched it. While this was occurring, SA Perry noticed the defendant take the aisle seat in a row in front of this woman and place a black backpack on the window seat. SA Perry then noticed the defendant move the bag from on top of the window seat to underneath it. The defendant was seated within earshot of SA Perry and the woman with whom SA Perry was speaking.

After SA Perry was done talking to the woman, he began to speak with the defendant. At the time this occurred, TFO Chavez was at the front of the bus behind the driver. TFO Chavez is approximately 5'5" tall and weighs approximately 130 pounds. SA Perry was in the aisle slightly behind the defendant. SA Perry is approximately 5'8" tall and weighs approximately 215 pounds. Both officers were in plain clothes with their weapons concealed underneath clothing. SA Perry spoke with the defendant while standing slightly to the rear of his seat and in the aisle. This gave the defendant an unobstructed path to the exit. The defendant is approximately 5'11" tall and weighs approximately 180 pounds. Gov't Ex. 5. At the time of the initial encounter with the defendant, the parties in question were at the following approximate locations on the bus:

---

[1] SA Perry recorded his conversations that day. The audio recording will be offered as Government Exhibit 1 and will be forwarded to the Court under separate cover. A transcript of SA Perry's conversation with the defendant is attached as Government Exhibit 1A.



*Gov't Ex. 2: Approximate Locations of the Officers and Defendant*

SA Perry introduced himself as a police officer, showed the defendant his DEA badge, and asked for and received permission to speak with the defendant. During the ensuing conversation with the defendant, SA Perry asked him where he was going, where he was coming from, he asked to see his ticket, and asked him for identification. The defendant responded he was going to Joplin from Arizona, he provided SA Perry a ticket with the name Mike Johnson, Gov't Ex. 4 at 6, and he said he did not have identification on him. Knowing that the defendant had placed a bag under his seat, SA Perry next asked the defendant if he had any luggage with him. The following colloquy occurred:

3

```
4   JP:   Okay.  Do you have luggage with you, sir?

5   NJ:   None at all.

6   JP:   Okay.  Nothing underneath the bus?

7   NJ:   No.

8   JP:   How 'bout underneath your seat?  Anything underneath your seat?

9   NJ:   No.
```

*Gov't Ex. 1A at 2.*

Because the defendant had lied about having a bag underneath his seat, SA Perry suspected the bag contained contraband. As a result, SA asked if the defendant had "weapons or anything on [his] body?" Gov't Ex. 1-A at 2. The defendant responded "No." *Id.* SA Perry then asked the defendant for consent to conduct a pat-down. *Id.* After the defendant consented to a pat-down, SA Perry asked the defendant to stand up, and then conducted the pat-down. *Id.* While doing so, SA Perry moved towards the back of the bus to give the defendant additional room to enter the aisle for the pat-down. The pat-down did not uncover any contraband or dangerous articles so SA Perry turned his attention to the bag the defendant had placed under his seat and the following conversation ensued:

```
4   JP:   And I noticed there's a black bag down here, is this your bag down here?

5   NJ:   No.

6   JP:   It's not?

7   NJ:   Yes...it is.

8   JP:   It is or isn't?

9   NJ:   Yes, sir, it is.  It's my, all it is some clothes.
```

*Gov't Ex. 1A at 2*

4

After confirming the black bag was his, SA Perry asked for permission to search it "for contraband." *Id.* at 3. After giving verbal permission for SA Perry to search his bag, the defendant began what SA Perry describes as a "self-search":

```
10   JP:   Okay. You give me permission to search it for contraband, sir?

11   NJ:   Yeah, go ahead. Clothes... Yes, sir, it's all clothes...dirty too though.

12   -Brief pause in the conversation-

13   NJ:   It's clothes.

14   JP:   Kay, what 'bout inside this right here? Black bundle right there? Okay, sir, I need you to
15         go ahead and put your hands up here for me.
```

*Gov't Ex. 1A at 2*

During this exchange, the defendant did not turn over custody of the bag to SA Perry, nor did he let SA Perry touch it. Rather, the defendant brought the bag out from underneath the window seat, stood up, unzipped the bag, and began showing its contents to SA Perry, *i.e.*, doing the search himself. To SA Perry this was another indicator that the defendant was attempting to hide contraband from him because he had seen previous defendants he had arrested with narcotics attempt to use the same tactic. As the defendant showed SA Perry the clothes in the bag some of them began to spill out onto the window seat. At first, SA Perry moved into the aisle directly adjacent to the defendant's seat in order to view the contents of the bag. But, the view was obstructed by the defendant. SA Perry then moved to the row of seats behind the defendant and looked over the seats into the bag.

5



*Gov't Ex. 3: Approx. Locations During the "Self-Search."*

As the defendant continued to show SA Perry the inside of his bag, SA Perry saw what he described at the time as a "black bundle." Gov't Ex. 1-A at 3. The "black bundle" he saw in the bag was a large oblong shape concealed within the leg portion of a pair of thermal underwear, or "long johns":



*Gov't Ex. 4 at 1.*

SA Perry has been working for the DEA doing drug interdiction on the Greyhound and Amtrak lines at the station in Albuquerque for in excess of 19 years. During that time he has arrested over 1,600 defendants for trafficking in narcotics. Because of those 19 years and over 1,600 arrests, SA Perry is familiar with behavioral and verbal indicators that someone has contraband in their possession. He has also become very familiar with the

means and methods used to traffic narcotics. Because the defendant had lied about owning the bag under his seat, said he was not travelling with any identification, and conducted a "self-search" of his bag, SA Perry strongly suspected he had contraband in the bag. When SA Perry saw the large, oblong shape concealed within the leg of the thermal underwear he believed the oblong shape was the contraband the defendant had been trying to hide. Furthermore, SA Perry believed that contraband was narcotics because he had seen narcotics packaged, shaped, and concealed in this manner many times in the past. SA Perry then asked the defendant to place his hands on the seat in front of him and placed him under arrest. At the time he arrested the defendant, SA Perry had never touched the bag or its contents.

After placing the defendant under arrest, TFO Chavez came up to escort the defendant off the bus. As he began to re-pack the contents of the bag, SA Perry touched the bundle and felt a hard-packed substance consistent with narcotics. The defendant and his bag were transported back to the DEA Albuquerque District Office. A search incident to arrest resulted in the retrieval of two bundles wrapped in aluminum foil weighing 883.9 grams of methamphetamine.

After being advised of his *Miranda* rights, the defendant said that he was transporting the bag, which was given to him to transport, from Phoenix, Arizona to Joplin, Missouri. He said that he believed that the bag contained one bundle of marijuana which was wrapped inside of aluminum foil. He was going to be paid $500.00 to transport and deliver the contents of the bag to Joplin, Missouri.

**ARGUMENT**

I. **THE DEFENDANT WAS NOT SEIZED PRIOR TO HIS ARREST, THUS THE EVIDENCE AND HIS STATEMENTS WERE NOT TAINTED BY AN ILLEGAL DETENTION.**

When a person is seated on a bus or train and has no desire to leave, the "free to leave" analysis is inapplicable. *Florida v. Bostick,* 501 U.S. 429, 438 (1991) (internal citation and quotation omitted*); United States v. Ward*, 961 F.2d 1526, 1530 (10th Cir. 1992) (luggage) *overruled in part by United States v. Little*, 18 F.3d 1499 (10th Cir. 1994) (en banc). "The crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Bostick*, 501 U.S. at 436-437 (internal citation and quotation omitted); *Ward*, 961 F.2d at 1530. This analysis is conducted from the perspective of the objective reasonable person, not that of the individual defendant. *Easley*, 911 F.3d 1074, 1081 (10th Cir. 2018). The primary concern of the Court is whether *law enforcement* created a coercive environment; a person cannot be seized within the meaning of the Fourth Amendment by social or peer pressure. *Id.* at 1080.

The defendant appears to contend, at least in part, that he did not feel free to ignore the police and go about his business. Def.'s Mot. at 17; Doc. 30 at 1-2.  However, the facts are not as the defendant claims.  Here, as in *Easley*, "none of the traditional indicia of a coercive environment were present." 911 F.3d at 1079. SA Perry approached the defendant at the back of the bus while TFO Chavez remained at the front; the officers kept their weapons and handcuffs concealed until the arrest; SA Perry did not use aggressive language; SA Perry only briefly blocked the defendant's egress when attempting to gain a

8

vantage point from which to view the defendant's "self-search"; and the encounter occurred in the presence of the other passengers on the bus. Furthermore, SA Perry clearly stated the purpose of the consensual encounter by asking the defendant for "permission to search [the bag] for contraband". Gov't Ex. 1A at 3; *see Easley*, 911 F.3d at 1081. In sum, the encounter was strikingly similar to the encounter in *Easley.* 911 F.3d at 1079-80. To the extent there are differences between the two, none of them are sufficient, alone or in combination, to have created a coercive environment. *Id.* at 1081.

In determining whether there was a coercive environment, the United States respectfully urges the Court to look at two of the other encounters SA Perry had with other passengers on the bus that day. First, after terminating the encounter, the first person SA Perry talked to on the bus subsequently attempted to re-engage SA Perry in a conversation. Gov't Ex. 1A at 1:23-2:20. If SA Perry had created a coercive environment, then it is unlikely that a passenger who had just escaped his suspicions would attempt to re-engage him. Thus, the first encounter indicates that there was no coercive environment at the start of the recording. Second, after arresting the defendant on the bus, a passenger is waiting by SA Perry to take the defendant's now vacant seat. *Id.* at 5:37-5:41. Presumably this man has just seen SA Perry arrest the defendant sitting in the very seats he wishes to occupy. Unperturbed by the presence of a law enforcement officer conducting his duties, the passenger intrudes upon SA Perry's personal space sufficient for SA Perry to notice him. SA Perry then gets out of the passenger's way so the passenger can take the seat. Thus, the passenger continued about his business despite the presence of an officer who had just effected an arrest. This paints a clear picture that, from start to finish, the environment on

the bus was not coercive. Therefore, the defendant was not seized, there was no illegal detention, and none of the evidence or statements were tainted.

Despite the similarities with *Easley*, the defendant concludes that "[a] reasonable person, and in particular an African American person, would not have felt comfortable to walk off of the bus, past two law enforcement officers." Def.'s Mot. at 17. The defendant relies on the District Court opinion in *Easley*, 293 F. Supp. 1288 (DNM 2018). But, this line of argument was foreclose by the Tenth Circuit. *Easley*, 911 F.3d at 1081; *see United States v. Clines*, No. 18-CR-1572 WJ, 2019 U.S. Dist. LEXIS 20869, at *29-30 (D.N.M. Feb. 7, 2019) (Johnson, J.); *see also United States v. Jimenez*, No. 17-2381 JCH, 2018 U.S. Dist. LEXIS 20078, *12-15 (D.N.M. Feb. 7, 2018) (Herrera, J.).

## II. SA PERRY DID NOT SEARCH THE DEFENDANT'S BAG BEFORE HE ARRESTED THE DEFENDANT.

What a person knowingly exposes to the public is not subject to the protections of the Fourth Amendment. *United States v. Flowers*, 336 F.3d 1222, 1228 (10th Cir. 2003) (quoting *Katz v United States*, 389 U.S. 347, 351 (1967)); *United States v. Villaba,* No. CR 13-0664 JB, 2013 U.S. Dist. LEXIS 128343, *80 (D.N.M. Aug. 21, 2013) (Browning, J.). Evidence which is recovered by merely looking at what is already exposed is not a search for Fourth Amendment purposes, and therefore does not require even reasonable suspicion. *Villaba*, 2013 U.S. Dist. LEXIS 128343 at *80 (quoting *Arizona v. Hicks*, 480 U.S. 321, 328 (1987)). In the context of searching luggage, a visual inspection of that which is in plain view does not constitute a search. *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998); *United States v. Fernandez*, No. 17-CR-3237- JAP, 2018 U.S. Dist. LEXIS 173287, at *10 (D.N.M. Oct. 9, 2018) (Parker, J.). Furthermore, police officers are not

10

constrained "to viewing the evidence with their bear eyes or from a particular position." *Villaba*, 2013 U.S. Dist. LEXIS 128343 at *81. Officers, for example, may use artificial means to illuminate an area or change position in order to gain a better vantage point without conducting a search for Fourth Amendment purposes. *Id*. at 81-82.

The Tenth Circuit found a defendant's room and suitcase were not protected by the Fourth Amendment when he exposed them to the public by drawing back his curtain and opening the door to his room in response to a knock by a DEA Special Agent. *United States v. Harfst*, No. 95-2164, 1996 U.S. App. LEXIS 5298, at *10-11 (10th Cir. Mar. 25, 1996). The Court found that the defendant "abandoned his privacy" when he pulled back the curtain and opened the door and, thus, the Special Agent's visual "search" from outside of the room was not a Fourth Amendment violation. *Id*. Similarly, the District Court for the District of Kansas was presented with a case where a police officer placed himself in a position to see the exposed x-ray images of a defendant's bag at the airport in order to determine if he was illegally transporting bulk currency. *United States v. Walton*, Case No. 95-20086, 1996 U.S. Dist. LEXIS 7738 (D. Kan. May 22, 1996). The Court found that the defendant had knowingly exposed the x-ray images of his bag to the public. *Id.* at 13. As a result, the officer did not search the bag within the meaning of the Fourth Amendment when he merely positioned himself to view those images without the defendant's knowledge. *Id*. Thus, *Harfst* and *Walton* stand for the proposition that what a defendant knowingly exposes to the public cannot be subjected to a visual search in violation of the Fourth Amendment.

Here, the defendant initially gave verbal consent for SA Perry to search his bag. But, the search never occurred because the defendant began to "search" the bag himself,

*i.e.*, he began to voluntarily expose the contents of the bag to SA Perry. SA Perry did not tell him to do this. SA Perry did not direct him during the process. The defendant did it completely and voluntarily on his own. In the process of doing so, the defendant exposed the black long johns containing the bundle of drugs to SA Perry's field of view. The fact that SA Perry had to move in order to obtain a field of view that allowed him to see bundles of narcotics is of no moment. Simply put, when the defendant opened his bag and exposed its contents to the public he "abandoned his privacy" in the contents and any claim to a Fourth Amendment violation. Thus, SA Perry did not search the bag prior to the arrest of the defendant. Because he did not search the bag he could not have exceeded the scope of search.

### III.     IF THERE WAS A SEARCH, THE DEFENDANT CONSENTED TO IT.

Assuming, arguendo, there was a search, the defendant consented to the search of his bag. The Fourth Amendment permits a law enforcement officer to approach an individual in a public place, identify himself as a law enforcement officer, and ask questions. *Florida v. Royer*, 460 U.S. 491, 496 (1983). The Tenth Circuit has articulated a two-step test for determining the validity of consent: "(1) [t]here must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) [t]he government must prove consent was given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (internal quotation marks omitted). The government has the burden of proof. *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). Mere submission is not valid consent. *United States v. Manuel*, 922 F.2d 272, 275 (10th Cir. 1993). The Court should make its determination based on the totality of the circumstances. *United States v. Price,* 925 F.2d 1268, 1270 (10th Cir. 1991).

12

The factors the court may consider include the subjective characteristics of the defendant. *See Easley*, 911 F.3d at 1081. Race is one factor among many it may consider. *See id.; Clines*, 2019 U.S. Dist. LEXIS 20869 at *29-30. The core of the Court's concern is whether the defendant's will was overcome by the government in obtaining the consent. *Miller v. Fenton*, 474 U.S. 104, 116-117 (1985).

In *Clines,* the defendant relied on the District Court opinion in *Easley* to argue that the voluntariness of the defendant's consent should be "carried out against a historical backdrop of fear between people of color and law enforcement." 2019 U.S. Dist. LEXIS at *30 (internal quotation marks omitted). In finding the defendant's consent was voluntary this Court found the defendant gave "specific and unequivocal" responses, there was no "force or threat of force," SA Perry was "in plain clothes and [had] no weapons in view", and SA Perry "was even-tempered and polite. *Id*. at *30-31. Regarding the race of the defendant, this Court noted the reasoning proffered had been rejected by the Tenth Circuit and the defendant's unease was just as likely to have come from his interactions with the criminal justice system as it was from his race.

The facts and argument here are extremely similar to those in *Clines*: the defendant verbally consented, there was no show of force, SA Perry was calm and polite, and the tone and duration of the encounter all clearly indicated a consensual encounter and agreement to search. Moreover, the defendant here demonstrated nonverbal consent and freewill by both limiting the scope of the search and conducting it himself. The bulk of the defendant's claim is based on his general proposition that an African American person would not have felt free to decline the search. That, however, is "but one factor to consider under a totality approach." *Id*. at *29-30. That single factor pales in comparison to all of the others and,

13

like in *Clines*, is just as likely explained by the defendant's interactions with the criminal justice system. Doc. 22. Thus, under the totality of the circumstances, the consent was voluntary and the motion should be denied.

## IV. SA PERRY HAD PROBABLE CAUSE TO ARREST THE DEFENDANT AND SEIZE THE DRUGS, AFTER THE DEFENDANT VOLUNTARILY SHOWED HIM THE CONTENTS OF HIS BAG.

An arrest must be supported by probable cause and the probable cause must exist at the moment of arrest. *United States v. Moya-Matute*, 559 F. Supp. 2d 1189, 1209 (D.N.M. 2008) (Browning, J.). Probable cause to arrest exists only when the facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Id*. (Internal citations and quotations omitted). This is an objective standard; the primary concern is whether a reasonable officer would have believed probable cause existed. *Id.* at 1209-10. Probable cause to arrests arises where the reasonable officer has established a reasonable probability that a crime has been committed. *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999). It does not require a certainty or facts sufficient to establish guilt. *Id.* at 766-67 (Internal citations omitted). It is determined based on a totality of the circumstances. *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008).

Prior to seeing the bundle in the defendant's bag SA Perry had established several factors that led him to believe the defendant's bag contained contraband:

- When SA Perry saw the defendant place the bag underneath the seat next to him it created suspicion for two reasons. First, he was close enough to SA Perry while SA Perry was conducting a search to hear that SA Perry was a law enforcement officer. Placing the bag out of sight in response to this is indicative of the defendant

14

attempting to hide contraband. Second, the defendant put his bag underneath the seat *next* to him. Thus, he was not only trying to hide the bag but he was also attempting to distance himself from it because he knew the contents of it could lead to criminal consequences.

- The defendant lied about having a bag with him. Lying about one's travel or baggage is a relevant factor in determining whether a crime has been committed. *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994) (travel route); *Ward*, 961 F.2d at 1530 (luggage).

- The defendant said he did not have identification with him. In SA Perry's experience, drug traffickers sometimes will not carry identification with them because they are travelling under a fake name.

- After admitting that the bag was his, the defendant attempted to conduct a "self-search" of the bag while blocking SA Perry's view of its contents with his body. In SA Perry's experience, this is a tactic he has seen when a person is trying to hide contraband while simultaneously attempting deflect the concerns of law enforcement. A court may consider the experience of narcotics officers when that experience allows them to make inferences of criminal conduct when they would seem innocuous to a normal person. *See United States v. Cortez*, 449 U.S. 411, 418 (1981); *United States v. Aispuro-Aristegui*, 453 F. App'x 795, 798 (10th Cir. 2011). Given that SA Perry has 19 years of experience doing drug interdiction that has resulted in over 1600 cases, the inferences he draws are supported by considerable weight.

Up to this point, SA Perry had a very strong suspicion that the defendant had contraband in the bag. But, he was not sure what the contraband was. Then, when he saw the bundle concealed within the long johns, he recognized that, based on the shape, size, and manner of concealment, the bundle was most likely narcotics. This Court has previously acknowledged SA Perry's ability to recognize a drug bundle as part of the probable cause determination when arresting a defendant. *See United States v. Wellams*, No. 12-CR-1393 MCA, 2013 U.S. Dist. LEXIS 201465, at *24 (D.N.M. Apr. 30, 2013) (Armijo, J.). Thus, the appearance of the bundle combined with the other factors and SA Perry's extensive experience gave SA Perry probable cause to arrest the defendant and seize the evidence. That is what he did.

Any search SA Perry conducted after the arrest was a lawful search incident to arrest. *See, e.g.*, *United States v. Edwards*, 632 F.3d 633, 642-43 (10th Cir. 2001) (citing *United States v Karo*, 468 U.S. 705, 717 (1984)).

### V.  THE DEFENDANT'S STATEMENTS SHOULD NOT BE SUPRESSED BECAUSE THEY WERE NOT THE PRODUCT OF AN ILLEGAL SEARCH OR SEIZURE.

To successfully suppress evidence as the fruit of Fourth Amendment violation, a defendant must first establish his Fourth Amendment rights were violated. *See United States v. Nava Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (internal citation omitted). The defendant then bears the burden of demonstrating a factual nexus between the violation and the challenged evidence. *Id.* Here, the defendant does not contest that the post-arrest statements were voluntarily given. Rather, he claims they are tainted from an illegal search. As outlined above, the defendant has not, and cannot, establish a Fourth Amendment violation. Thus, his motion should be denied.

### CONCLUSION

SA Perry did not search the defendant's bag and to the extent that he did, the defendant consented to it. Furthermore, SA Perry had probable cause to arrest the defendant, and the defendant was not seized SA Perry arrested him. Thus, the Court should deny the defendant's motion to suppress.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*Mark Pfizenmayer*
Mark Pfizenmayer
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87102
(505) 224-1481

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to defense counsel and probation.

  *Filed Electronically*
Mark Pfizenmayer
Assistant United States Attorney

17