# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 18-0220 JB

NATHANIEL DONALD JOHNSON,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Suppress Evidence, filed February 4, 2019 (Doc. 31)("Motion"); and (ii) the Defendant's Motion to Reconsider, filed November 4, 2019 (Doc. 79). The Court held an evidentiary hearing on March 18-19, 2019, and April 8, 2019. <u>See</u> Clerk's Minutes at 1, filed March 18, 2019 (Doc. 49); Clerk's Minutes at 1, filed April 8, 2019 (Doc. 56). The primary issues are: (i) whether the Court should suppress evidence that Drug Enforcement Administration ("DEA") Special Agent Jarrell Perry obtained after approaching Defendant Nathaniel Donald Johnson and searching his bag without a warrant where Perry spoke in a low tone, did not brandish a weapon, and did not block Johnson from leaving for the majority of the encounter; and (ii) whether the Court should suppress statements that Johnson made during a custodial interrogation, because there was no temporal or causal break between the interrogation and Johnson's arrest for possessing a bundle of methamphetamine that he was transporting between Phoenix, Arizona, and Joplin, Missouri. At the hearing, the Court indicated its inclination to deny the Motion to Suppress. <u>See</u> Transcript of Hearing at 15:20-18:2 (taken April 8, 2019), filed May 23, 2019 (Doc. 62). The Court denied the Motion to Suppress on July 30, 2019. <u>See</u> Order, filed July 30, 2019 (Doc. 68)("Order").

Subsequently, Johnson filed his Motion to Reconsider (Doc. 79). In this Memorandum Opinion and Order, the Court details the rationale for the denial of the Motion, and while the Court grants Johnson's Motion to Reconsider to the limited extent that it did reconsider its oral ruling and written Order denying the Motion, it decides not to change its decision, and will deny the Motion to Reconsider.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. The United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements. See United

States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings. . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

As a general matter, the Court finds Perry to be a more credible witness than Johnson. Perry testified cogently and thoroughly about the events of January 5, 2018. Although Johnson's testimony was also coherent and internally consistent, Johnson was, at times, less than forthright. Most notably, on cross-examination, Johnson initially denied certain underlying facts regarding a previously imposed term of probation that he was serving at the time of his encounter with Perry -- namely, that he had possessed a weapon and drugs. See Mar. 18 Tr. at 218:5-25; id. 219:1-11. In fact, Johnson did not admit that he had previously possessed a weapon or drugs until the United States reminded him that he was under oath. See Mar. 18 Tr. at 218:5-25; id. 219:1-11. The Court does not find Johnson's temporary memory lapse believable. Considering Johnson's lack of

---

[1] United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished opinion from the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this Circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Lopez-Carillo, United States v. Armando Martinez, 2019 WL 6127413 (10th Cir. 2019); and United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005); 180 F. App'x 827 (10th Cir. 2006), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

candor, the hearing testimony as a whole, and the demeanor of both witnesses, the Court is persuaded that Perry is more reliable about the case's events. Consequently, although the Court credits Johnson's largely undisputed testimony, where Johnson's testimony Perry's testimony diverge, the Court will adopt Perry's version of events. In accordance with this credibility determination, the Court makes the following findings of fact under rule 12(d) of the Federal Rules of Criminal Procedure.

1.      On January 5, 2018, Johnson, an African-American male, was traveling on an eastbound Greyhound Bus that stopped at the Greyhound/Amtrak station in Albuquerque. See Mar. 18 Tr. at 167:20-25; id. at 171:1-3.

2.      Perry was working drug interdiction operations at the Greyhound bus station in Albuquerque for the DEA. See Mar. 18 Tr. at 9:1-12.

3.      Passengers deboarded the bus while it was stopped at the station. See Mar. 18 Tr. at 12:2-5; id. at 171:1-6.

4.      Before passengers re-boarded the bus, Perry and Task Force Officer Seth Chavez boarded the bus. See Mar. 18 Tr. at 171:22-25; id. at 171:1-5.

5.      Chavez remained at the bus' front, while Perry positioned himself at the bus' rear to question passengers as they boarded. See Mar. 18 Tr. at 32:1-12; id. at 39:21-23; id. at 172:17-23.

6.      Perry questioned two passengers as they boarded the bus. See Nathaniel Johnson Encounter at 00:01:22-02:50, filed February 19, 2019 (Doc. 35-1)("CD").[2]

---

[2]The United States filed a Notice of Lodging of Exhibit 1 to Response to Defendant's Motion to Suppress Evidence, filed November 22, 2019 (Doc. 36). A compact disc was delivered to the Court on February 22, 2019, containing an audio recording of the encounter between Johnson and Perry. The Court's citations to the audio recording take the following form: CD at 00:00:00.

7.       While Perry was speaking with those passengers, he observed Johnson sit in an aisle seat ahead of where Perry was standing.  See Mar. 18 Tr. at 22:22-25; id. at 23:1-4.

8.       Johnson sat down next to a black backpack.  See Mar. 18 Tr. at 22:22-23:4.

9.       Johnson picked the backpack up and put it underneath the seat next to him.  See Mar. 18 Tr. at 23:21-23.

10.      Johnson overheard the questions Perry asked other passengers.  See Mar. 18 Tr. at 175:13-23.

11.      Perry approached Johnson.  See Mar. 18 Tr. at 26:2-3.

12.      During his encounter with Johnson, Perry was dressed in plain clothes and did not brandish his firearm.  See Mar. 18 Tr. at 68:19-22; id. at 211:20.

13.      Perry spoke quietly and did not use aggressive language with Johnson.  See Mar. 18 Tr. at 211:8-18.

14.      Perry addressed Johnson as "sir," repeatedly said "please" when making requests, and thanked Johnson for his cooperation.  See CD at 00:02:50-04:30.

15.      Perry identified himself as a police officer, showed Johnson his badge, and asked if he could speak with Johnson.  See Mar. 18 Tr. 23:10-15; id. at 24:9-10.

16.      The encounter occurred on a confined, cramped Greyhound bus within view of the other passengers.  See CD at 00:02:50-04:30; Mar. 18 Tr. at 156:14; id. at 211:13-14.

17.      Johnson responded affirmatively.  See CD at 00:02:54-55.[3]

_____

        [3]Johnson responded "Mh-mm." CD 2:54-55 min. The Court finds that Johnson's response was affirmative based on his inflection. See United States v. Harfst, 81 F.3d 173 (10th Cir. 1996)(agreeing with the district court that the inflection of the defendant's voice indicates an affirmative response).

18.     Perry inquired about Johnson's travel plans.  <u>See</u> CD at 00:02:55-03:00.

19.     Johnson informed Perry that he was traveling from Arizona to Joplin, Missouri.  <u>See</u> CD at 00:02:55-03:00.

20.     Perry asked Johnson for his ticket, and Johnson handed his ticket to Perry.  <u>See</u> Mar. 18 Tr. at 26:15-17; <u>id.</u> at 183:21-22.

21.     The ticket was issued to a "Mike Johnson."  <u>See</u> Mar. 18 Tr. at 26:15-17; <u>id.</u> at 212:22-24.

22.     Perry immediately returned the ticket to Johnson.  <u>See</u> Mar. 18 Tr. at 26:17-18.

23.     Perry asked Johnson if he had identification on him.  <u>See</u> CD at 00:03:13-16; Mar. 18 Tr. at 26:21-22

24.     Johnson responded that he did not have any identification.  <u>See</u> CD at 00:03:13-16; Mar. 18 Tr. at 26:21-22

25.     Perry testified that, in his experience, drug traffickers often do not travel with identification, because they are traveling under a false name.  <u>See</u> Mar. 18 Tr. at 27:12-21.

26.     Johnson explained that he was going to Joplin for probation.  <u>See</u> CD at 00:03:10-11.

27.     Perry then asked Johnson if he was traveling with luggage.  <u>See</u> Mar. 18 Tr. at 215:8-9.

28.     The following colloquy occurred:

Perry:          Okay.  Do you have any luggage with you, sir?

Johnson:        None at all.

Perry:          Okay. Nothing under the bus?

Johnson:        No.

Perry:          How about underneath your seat?  Anything underneath your seat?

Johnson:        No.

CD at 00:03:17-22.

29.     In combination with placing the black backpack underneath the seat next him, Johnson's denials that he had any luggage suggested to Perry that Johnson was attempting to distance himself from the backpack.  <u>See</u> Mar. 18 Tr. at 30:4-8.

30.     Perry then requested permission to conduct a pat down of Johnson for weapons, to which Johnson consented.  <u>See</u> CD at 00:03:27-28; Mar. 18 Tr. at 30:12-18.

31.     When Johnson stood up for the pat down, Johnson was partially in front of his seat and partially in the aisleway, causing Perry to have to step back.  <u>See</u> Mar. 18 Tr. at 31:2-6.

32.     Perry did not locate any weapons during the pat down.  <u>See</u> Mar. 18 Tr. at 31:7-9.

33.     After the pat down, the following colloquy occurred:

| | |
|---|---|
| Perry: | And I noticed there's a black bag down here, is this your bag down here? |
| Johnson: | No. |
| Perry: | It's not? |
| Johnson: | Yes, it is. |
| Perry: | It is or it isn't? |
| Johnson: | Yes, sir, it is.  It's my, all it is [sic] some clothes. |
| Perry: | Okay. You give me permission to search it for contraband, sir?[4] |

_____

[4]Johnson testified that Perry asked if he would consent to a search of his bag.  <u>See</u> Mar. 18 Tr. at 186:14-16.  Johnson claims that the meaning of consent confused him.  <u>See</u> Mar. 18 Tr. at 186:10-18.  The Court's review of the audio recording of the encounter, however, confirms that Perry asked for "permission" to search the bag for contraband and not for consent.  CD at 00:03:55-57.

| Johnson: | Yeah, I am doing it.[5] Clothes . . . Yes, sir, it's all clothes . . . . [D]irty too though. It is clothes. |
| Perry: | What about inside this right here? Black bundle right there? Okay, sir, I need you to go ahead and put your hands up here for me. |
| Johnson: | Okay. |

CD at 00:03:43–:04:20.

34. When Perry began questioning Johnson about the bag, Perry was standing behind Johnson. See Mar. 18 Tr. at 30:21-22; Officer Movement Diagram, filed February 19, 2019 (Doc. 35-3)(United States' Hearing Exhibit 3).

35. Johnson removed the backpack from underneath the window seat, opened it, and began to move around the bag's contents. See Mar. 18 Tr. at 35:7-10.

36. At this time, Johnson was sitting.[6] See CD at 00:04:30-33; Mar. 18 Tr. at 189:18-21.

37. Johnson attempted to shield the bag's contents from Perry's view. See Mar. 18 Tr. at 37:15-16.

38. When that occurred, Perry stepped adjacent to Johnson, briefly blocking Johnson's egress to view the contents of Johnson's bag. See Mar. 18 Tr. at 37:12-16; Officer Movement Diagram.

39. Perry, concerned for his safety, then moved behind Johnson. See Mar. 18 Tr. at 36:12-17.

---

[5]The United States contends that Johnson responded: "Yeah, go ahead." Response at 5. The Court does not agree with the United States. The Court finds that Johnson responded, "Yeah, I am doing it." CD at 00:03:56-57.

[6]Perry testified that Johnson was standing when he conducted the self-search of his bag. See Mar. 18 Tr. at 35:20-24. In the audio recording of the encounter, however, Perry tells Johnson to stand up during the arrest. See CD at 00:04:30-33. There is no indication that Johnson repositioned himself during the thirty-eight seconds between the self-search and the arrest. See CD at 00:03:55-04:33. Thus, the Court finds that Johnson was sitting during the self-search.

40.    Perry testified that, in his experience, individuals will conduct a "self-search" to attempt to conceal contraband while deflecting law enforcement's concerns.  <u>See</u> Mar 18 Tr. at 38:9-14.

41.    Despite Johnson's attempt to conceal the contents of the bag, Perry observed a black bundle inside the bag.  <u>See</u> Mar. 18 Tr. at 39:14-20.

42.    When Perry asked "[w]hat about inside this right here?  Black bundle right there?" he was positioned so that he could not reach the bag's contents.  <u>See</u> Mar. 18 Tr. at 113:16-18.

43.    Perry merely pointed at the black bundle.  <u>See</u> Mar. 18 Tr. at 113:16-18.

44.    In Perry's twenty years of experience, drug traffickers hide bundles of illegal narcotics inside sleeves, jackets, pants, shirts, and underwear.  <u>See</u> Mar. 18 Tr. at 41:14-20.

45.    Based on the size, shape, and concealment method, Perry believed the bundle contained illegal narcotics, although he did not definitely know whether the bundle contained narcotics at this point.  <u>See</u> Mar. 18 Tr. at 43:16-44:2.

46.    Perry asked Johnson what the bundle was, and Johnson did not respond.  <u>See</u> Mar. 18 Tr. at 41:23-24.

47.    After Johnson did not respond, Perry asked Johnson to put his hands up, and he handcuffed Johnson and introduced Chavez as his partner to Johnson.  <u>See</u> CD at 00:04:31-32; Mar. 18 Tr. at 42:1-2.

48.    Chavez escorted Johnson off the bus.  <u>See</u> Mar. 18 Tr. at 44:20-22.

49.    Only after the arrest did Perry touch or search Johnson's bag.  <u>See</u> Mar. 18 Tr. at 42:3-10.

50.    Perry discovered that the bundle was a package wrapped in tin foil that was placed inside an item of black clothing.  <u>See</u> Mar. 18 Tr. at 44:25-45:1.

51.     Inside the package was a substance that field-tested positive for methamphetamine. See Mar. 18 Tr. at 46:20-24.

52.     During the search of the bag, Perry also discovered a second bundle. See Mar. 18 Tr. at 46:13-16.

53.     After the arrest, Perry attempted to arrange the backpack's contents in the same way he first saw them in order to take photographs. See Mar. 18 Tr. at 116:16-21; 208:1-209:3.

## PROCEDURAL BACKGROUND

Johnson filed the Motion on February 4, 2019, seeking to suppress evidence seized during his January 5, 2018 arrest and his subsequent statements. See Motion at 1. On July 30, 2019, the Court denied the Motion. See Order at 1. Soon after, Johnson filed the Motion to Terminate Counsel of Record, filed September 16, 2010 (Doc. 70). On November 4, 2019, Johnson filed the Motion to Reconsider. See Motion to Reconsider at 1.

**1.     Briefing.**

Johnson is charged with possession of more than 500 grams of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). See Criminal Complaint, filed January 8, 2018 (Doc. 1). Perry discovered the methamphetamine while working interdiction at the Greyhound Station in Albuquerque, New Mexico. See Mar. 18 Tr. at 9:1-12; 46:20-24. In his Motion, Johnson argues that the Court must suppress the evidence Perry obtained, because Perry obtained the evidence without a warrant after an unauthorized search of Johnson's bag. See Motion at 1. As an alternative basis for the Court to rule, Johnson also asserts that Perry obtained the evidence after a coerced and involuntary consent, which ultimately led to the discovery of the evidence. See Motion at 1. Finally, Johnson claims that the Court must suppress statements that

he made during a custodial interrogation, because no temporal or causal break occurred between his unlawful arrest and his subsequent interrogation.  <u>See</u> Motion at 1-2.

The United States responds that the encounter between Johnson and Perry was consensual, and because Perry did not seize Johnson before his arrest, an illegal detention did not taint the evidence and Johnson's statements.  <u>See</u> United States' Response to Defendant's Motion to Suppress Evidence at 8-10, filed February 19, 2019 (Doc. 35)("Response").  The United States also avers that Perry did not search Johnson's bag until after he was arrested, and, alternatively, that if a search occurred before the arrest, Johnson consented to it.  <u>See</u> Response at 10, 12.  The United States further contends that Perry had probable cause to arrest Johnson after Johnson voluntarily showed Perry his bag's contents.  <u>See</u> Response at 14.  Finally, the United States argues that the Court should not suppress Johnson's statements, because they were not the product of an illegal search or seizure.  <u>See</u> Response at 16.  The United States attached in support of its Response six photographs of Johnson's backpack and the bundle which Perry found in Johnson's backpack.  <u>See</u> Photographs, filed February 19, 2019 (Doc. 35).

2.      **The Hearing.**

On March 18-19, 2019, and April 8, 2019, the Court held evidentiary hearings on the Motion.  During the first half of the March 18 hearing, Perry testified on behalf of the United States regarding Johnson's January 5, 2018, arrest.  Perry explained that he works drug interdiction at the Greyhound bus station in Albuquerque for the DEA.  <u>See</u> Mar. 18 Tr. at 9:1-12.  While in the process of observing Johnson, Perry became suspicious.  <u>See</u> Mar. 18 Tr. at 24:2-8.   Perry observed Johnson sit next to a black backpack.  <u>See</u> Mar. 18 Tr. at 22:22-23:4.  Perry then approached Johnson and began asking him questions.  <u>See</u> Mar. 18 Tr. at 26:2-4.  Perry testified

that Johnson informed Perry that Johnson was traveling without identification. <u>See</u> Mar. 18 Tr. at 26:21-22. When Perry probed, Johnson repeatedly denied that he was traveling with luggage. <u>See</u> Mar. 18 Tr. at 33:20-23; CD at 00:03:17-22. Perry testified: "That [i]s not what a normal passenger would do, lie four times about not having luggage, [and] then claim it. It raised my suspicion that he definitely had contraband in [the bag]." Mar. 18 Tr. at 33:20-23. After Johnson denied having luggage, Perry requested permission to conduct a pat down. <u>See</u> Mar. 18 Tr. at 30:12-16. Johnson consented to the pat down. <u>See</u> Mar. 18 Tr. at 30:17-18. Perry testified that at this point he was standing behind Johnson's seat, partially in the aisleway. <u>See</u> Mar. 18 Tr. at 30:21-22. When Johnson stood up, Johnson was partially in front of his seat and partially in the aisleway, causing Perry to have to step back. <u>See</u> Mar. 18 Tr. at 31:2-6. Perry performed the pat down, which did not uncover any weapons. <u>See</u> Mar. 18 Tr. at 31:7-9. Following the pat down, Perry asked Johnson whether the backpack belonged to him. <u>See</u> Mar. 18 Tr. at 32:18-22. Johnson initially denied that the backpack was his, but when asked again, he acknowledged that it was his. <u>See</u> Mar. 18 Tr. at 32:23-25. Johnson then conducted a "self-search" of the bag whereby he quickly moved the contents of the bag around and, according to Perry, attempted to block Perry's view of the bag's contents. Mar. 18 Tr. at 35:7-10 <u>See id.</u> at 43:1-9. Perry stepped forward, adjacent to Johnson's seat, briefly blocking Johnson's egress, to see what Johnson was doing with the bag. <u>See</u> Mar. 18 Tr. at 37:12-16; Officer Movement Diagram. Despite Johnson's attempt to conceal the contents of the bag, Perry testified that he observed a black bundle inside the bag. <u>See</u> Mar. 18 Tr. at 39:14-20. Based on the size, shape, and Johnson's attempted concealment, Perry believed the bundle contained illegal narcotics. <u>See</u> Mar. 18 Tr. at 43:16-21. This belief was rooted in Perry's twenty years of experience, although he did not definitely know whether the bundle contained narcotics

at this point.  <u>See</u> Mar. 18 Tr. at 43:22-25; 44:1-2.  Perry testified that he asked Johnson what the bundle was, and Johnson did not respond.  <u>See</u> Mar. 18 Tr. at 41: 23-24.  Perry then arrested Johnson.  <u>See</u> Mar. 18 Tr. at 41:25; <u>id.</u> at 42:1.  Following the arrest, Perry conducted a search of Johnson's backpack and discovered two bundles wrapped in tin foil.  <u>See</u> Mar. 18 Tr. at 44:25-45:1.  One of those bundles field-tested positive for methamphetamine.  <u>See</u> Mar. 18 Tr. at 46:20-24.

After Perry's testimony, Danny Garcia, an investigator with the Albuquerque Federal Public Defender's office, testified about the Greyhound bus' configuration.  <u>See</u> Mar. 18 Tr. at 126:21-24; <u>id.</u> at 128:1-11.  By way of example, Garcia testified about the distance between the rows on the bus, <u>see</u> Mar. 18 Tr. at 133:15-16, and the off-set nature of the rows on the left and right sides of the bus, <u>see</u> Mar. 18 Tr. at 134:14-22.

Finally, Johnson testified.  <u>See</u> Mar. 18 Tr. at 167:7.  His testimony was largely consistent with that of Perry's except in two important respects; first, Johnson testified that, when Perry conducted the pat down, Perry stepped into the aisleway effectively confining Johnson to his bus seat.  <u>See</u> Mar. 18 Tr. at 188:9-190:2.  Specifically, Johnson testified that, when he stood for the pat down, he simply "stood up in [his] seat. [His] feet never moved."  Tr. at 189:16-17.  He also explained Perry's positioning: "Well, after he did the pat-down, he never left from the front of me. He stayed right there, like toe to toe, when he went down to my ankles."  Tr. at 188:18-20.  "[Perry] never moved."  <u>See</u> Mar. 18 Tr. at 190:17.  Second, Johnson testified that, while he was showing Perry the contents of his bag, Perry pointed into the bag at the black bundle.  <u>See</u> Mar. 18 Tr. at 191:8-14 ("[H]e pointed in the bag and said, 'what about that black bundle right there?'"); <u>id.</u> at 191:15-17 ("He pointed his finger right in front of my face in the bag, was specifically showing

me where he was looking at.").

### 3. Johnson's Supplemental Argument and Authority.

On April 5, 2019, Johnson submitted a Supplement to Final Argument and Supplemental Authority, filed April 5, 2019 (Doc. 55)("Supplement"). There, Johnson seeks to clarify the record with respect to the exhibits and the testimony from the hearing. See Supplement at 1-7. Specifically, Johnson argues that the United States staged the photographs of Johnson's bag and the drugs found therein that the United States attached to its Response, and that the incriminating character was "not immediately apparent." Supplement at 5.[7]

Further, Johnson challenges Perry's testimony that Johnson was standing while conducting the self-search of his bag. See Supplement at 5-6. Johnson also argued that the plain view exception to the warrant requirement does not apply to this case's facts because Perry was not certain as to the bundle's contents before he conducted a warrantless search of Johnson's bag. See Supplement at 7-10.

### 4. Johnson's Motion to Reconsider.

Johnson filed a Motion to Reconsider on November 4, 2019 (Doc. 79). Johnson, now proceeding pro se, makes the same arguments raised in prior briefing. See Motion to Reconsider at 1. First, Johnson again argues that he limited the scope of his consent to search. See Motion to Reconsider at 2-3. Next, he argues that Perry lacked probable cause for the arrest, because of the plain-view doctrine's limitations. See Motion to Reconsider at 4-7. Johnson previously raised

---

[7]The Court concludes that Perry arranged items in Johnson's backpack prior to taking the photographs. See Mar. 18 Tr. at 116:16-21; id. 208:1-209:3. This conclusion does not bear on whether Perry had probable cause to arrest Johnson. The Court concludes that, whether the bag's contents were arranged slightly differently does not bear on the Perry's probable cause to arrest Johnson.

these arguments in the Motion and Supplement.  <u>See</u> Motion at 1; Supplement at 7-12.

The United States responds.  <u>See</u> United States' Response to Defendant's Motion for Relief Under *Napue v. Illinois*, 360 U.S. 264 (1959), filed November 18, 2019 (Doc. 80)("Motion to Reconsider Response").  The Motion to Reconsider Response simply states that the United States considers Johnson's arguments cumulative and will not address them unless the Court orders a response.  <u>See</u> Motion to Reconsider Response at 1.

## LAW REGARDING SEIZURES UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION

For purposes of analyzing Fourth Amendment seizures, interactions between police and citizens are divided into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  <u>See</u> <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000).  "A police officer may seize someone either by physical force or a show of authority."  <u>United States v. Roberson</u>, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing <u>United States v. Salazar</u>, 609 F.3d 1059, 1064 (10th Cir. 2010)).  "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'"  <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991)).  The court applies an objective standard to determine the existence of a show of authority.  <u>United States v. Salazar</u>, 609 F.3d at 1064.  The court asks "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  <u>United States v. Salazar</u>, 609 F.3d at 1064 (internal quotation marks omitted)(quoting <u>California v. Hodari D.</u>, 499 U.S. at 628).  "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."  <u>United States v. Ojeda-Ramos</u>, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting

United States v. Drayton, 536 U.S. 194, 201 (2002)).  See Florida v. Bostick, 501 U.S. 429, 434 (1991)("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required" (quoting California v. Hodari D., 501 U.S. at 534)).  The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064, but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).  "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. at 437 (quoting Michigan v. Chesternut, 486 U.S. 567 (1988)).

### 1.    Consensual Encounters.

"Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." Oliver v. Woods, 209 F.3d at 1186.  "An encounter is consensual if the defendant 'is free to leave at any time during the encounter.'" United States v. Esparza-Mendoza, 386 F.3d 953, 957 (10th Cir. 2004)(quoting United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996)).  Thus, "[p]olice officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures." United States v. Johnson, 364 F.3d 1185, 1188-89 (10th Cir. 2004).  In United States v. Moya-Matute, 735 F. Supp. 2d 1306 (D.N.M. 2008)(Browning, J.), the Court concluded that an interaction between border patrol agents and a defendant was consensual where the agents spoke in normal tones of voice, did not brandish

weapons, and "did no more than converse," with the defendant.  United States v. Moya-Matute, 735 F. Supp. 2d at 1340-42.

"A person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way."  United States v. Esparza-Mendoza, 386 F.3d at 958.  The Court, in Smith v. Kenny, 678 F. Supp. 2d 1124 (D.N.M. 2009)(Browning, J.), held that citizens could be seized when an officer issues a command to someone to leave his or her home and surrender to officers waiting outside.  See 678 F. Supp. 2d at 1173 (holding that a seizure could occur under these facts, but not deciding this issue because of factual disputes).  The Court determined that the late hour in addition to the direct order to exit the home and surrender to police custody "is a seizure because a reasonable person would not feel free to ignore the order."  678 F. Supp. 2d at 1173.  See United States v. Serna, No. CR 18-3321 JB, 2019 WL 1506541, at *30 (D.N.M. Apr. 5, 2019)(Browning, J.)(concluding that a seizure occurred where officers ordered a defendant to keep his hands visible and the defendant complied).  The Court found that the means of communication are not the focus of the Fourth Amendment analysis and that it is the arrested person's location that determines whether an arrest occurs in a home.  See Smith v. Kenny, 678 F. Supp. 2d at 1174.  Likewise, the Court concluded that a woman was seized after officers "insinuated that she was breaking the law, and ordered her to retrieve her son or that they would do it for her."  Wilson v. Jara, 866 F. Supp. 2d 1270, 1299 (D.N.M. 2011)(Browning, J.).  The Court has also concluded that the Fourth Amendment's protections against unlawful seizures do not apply to individuals "committed to long-term state custody." A.M. ex rel. Youngers v. N.M. Dep't of Health, 117 F. Supp. 3d 1220, 1263 (D.N.M. 2015)(Browning, J.).

2.      **Arrests.**

"On the opposite extreme are arrests, which are 'characterized by highly intrusive or lengthy search or detention.'" Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  Arrests are appropriate if an "officer has probable cause to believe a crime has been committed by the arrestee."   Oliver v. Woods, 209 F.3d at 1186. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)(quoting Jones v. City & Cty. of Denver, Colo., 854 F.2d 1206, 1210 (10th Cir. 1988)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052–53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499, (1983).  The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a *Terry* stop."); United States v. Reyes–Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").  "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'")(quoting Oliver v. Woods, 209 F.3d at 1185).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest. See 374 F. Supp. 2d at 976. The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974. See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

**3.** **Investigative Detentions.**

"An investigative detention, also called a Terry[v. Ohio, 392 U.S. 1 (1968)("Terry")] stop, is an encounter in which police may 'stop and briefly detain a person for investigative purposes.'" Morris v. Noe, 672 F.3d 1185, 1191 (10th Cir. 2012)(quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). A Terry stop is a Fourth Amendment seizure that does not require probable cause.

See Morris v. Noe, 672 F.3d at 1191 (quoting United States v. Sokolow, 490 U.S. at 7 (1989)). Indeed, Terry v. Ohio, "created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty." United States v. King, 990 F.2d at 1557 (quoting Terry v. Ohio, 392 U.S. at 16, 27)). For a Terry stop to be justified, the officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' . . . ." United States v. Sokolow, 490 U.S. at 7 (quoting Terry v. Ohio, 392 U.S. at 30). Additionally, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001). A police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d at 1462.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). See United States v. Serna, 2019 WL 1506541; United States v. Young, 347 F. Supp. 3d 747, 780-81 (D.N.M. 2018)(Browning, J.); Mocek v. City of Albuquerque, 3 F. Supp. 3d 1002, 1078-81 (D.N.M. 2014)(Browning, J.); United States v. Rodriguez, 836 F. Supp. 2d 1258 (D.N.M. 2011)(Browning, J.); United States v. Hernandez-Lopez, 761 F. Supp. 2d 1172, 1192-1209 (D.N.M. 2010)(Browning, J.); United States v. Sanchez, 376 F. Supp. 2d 1264, 1274 (D.N.M. 2005)(Browning, J.). Information "falling 'considerably

short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).

**4.      The Plain-View Exception.**

The Supreme Court has held that the Fourth Amendment's prohibition on unreasonable searches and seizures does not implicate what a person knowingly exposes to the public in plain view.  See Katz v. United States, 389 U.S. 347, 351 (1967)("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.").  Evidence that is recovered during "a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion."  Arizona v. Hicks, 480 U.S. 321, 328 (1987). Evidence or items of contraband discovered in plain view by an officer who is lawfully on the premises are thus admissible as evidence regardless whether the officer was executing a valid search warrant.  See Georgia v. Randolph, 547 U.S. 103, 137 (2006).  The plain-view doctrine has three requirements: "(i) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (ii) the item's incriminating character is immediately apparent; and (iii) the officer has a lawful right of access to the object itself."  United States v. Villaba, No. CR 13-0664 JB, 2013 WL 4782206, at *39 (D.N.M. Aug. 21, 2013)(Browning, J.); United States v. Morales-Ortiz, 376 F. Supp. 2d 1131, 1139 (D.N.M. 2004)(Browning, J).

Importantly, the United States Court of Appeals for the Tenth Circuit has held that, "when a container is 'not closed, or transparent, or when its distinctive configuration proclaims its contents, the container['s] . . . contents can be said to be in plain view.'"  United States v. Corral,

970 F.2d 719, 725 (10th Cir. 1992)(original alterations omitted)(quoting United States v. Donnes, 947 F.2d 1430, 1436 (10th Cir. 1991)).  Additionally, "where the police already possess knowledge approaching certainty as to the contents of the container, the search of the container does not unreasonably infringe upon the individual interest in preserving the privacy of those contents." United States v. Corral, 970 F.2d at 725-26.

In United States v. Villaba, the Court applied the plain-view doctrine to a DEA agent's toy truck inspection.  See 2013 WL 4782206, at *1. The agent turned a plastic truck over and inspected its screws on the bottom with a flashlight.  See 2013 WL 4782206, at *7-8.  The Court concluded that the use of a flashlight to illuminate the plastic truck's inside was consistent with the plain-view doctrine where the defendant consented to the search and where the agent had reasonable suspicion to search the truck.  See 2013 WL 4782206, at *40 (citing Texas v. Brown, 460 U.S. 730, 740 (1983)).

## ANALYSIS

The Court will not exclude the evidence.  The Court concludes that no seizure occurred before Perry arrested Johnson.  Moreover, even if Johnson was seized, reasonable suspicion supported Johnson's investigative detention.  Finally, the Court concludes that probable cause existed at the time of arrest and that the search of Johnson's bag was valid.

## I.    NO SEIZURE OCCURRED BEFORE PERRY ARRESTED JOHNSON.

The Fourth Amendment protects citizens from law enforcement's unreasonable seizures. See U.S. Const. amend. IV.  The Tenth Circuit has "enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police."  United States v. Hernandez, 847 F.3d 1257, 1264 (10th Cir. 2017). Those factors are:

the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

United States v. Hernandez, 847 F.3d at 1264 (citing United States v. Lopez, 443 F.3d 1280, 1284 (10th Cir. 2006)). "Although no single factor is dispositive, 'the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred.'" United States v. Hernandez, 847 F.3d at 1264 (quoting United States v. Lopez, 443 F.3d at 1284-85). The court evaluates these factors using an objective standard. See United States v. Easley, 911 F.3d 1074, 1079 (10th Cir. 2018). Thus, Johnson's testimony that he did not understand that he could refuse to give Perry permission to conduct a pat down, see Mar. 18 Tr. at 184:18–21, is of no matter to the Court's analysis. See United States v. Easley, 911 F.3d at 1079. The court instead focuses on whether a reasonable person would have felt free to terminate the encounter. See United States v. Easley, 911 F.3d at 1079.

"If an inquisitive agent approaches someone who does not want to respond, all the person must do is say so. But if one voluntarily answers an agent's non-coercive questions, the conversation falls outside the scope of the Fourth Amendment." United States v. Armando Martinez, No. 19-2010, 2019 WL 6127413, at *1 (10th Cir. Nov. 19, 2019)(unpublished). Johnson and Perry's conversation was voluntary. This case bears similarity to a recent Tenth Circuit opinion. See United States v. Easley, 911 F.3d 1074. In United States v. Easley, the Tenth Circuit reversed the district court's conclusion that a bus passenger who was arrested in Albuquerque on

very similar facts was illegally seized.  See 911 F.3d at 1077 (reversing 293 F. Supp. 3d 1288

(D.N.M. 2018)).  In that case,

> SA Perry[8] approached Ms. Easley, near the back of the bus, while Agent Godier
> remained at the front of the bus.  Second, neither SA Perry nor Agent Godier
> "brandished" a weapon.  SA Perry kept his gun and handcuffs concealed beneath
> his shirt.  Third, in reading the transcript of the audio recording, it would appear
> that SA Perry did not use "aggressive language."  Fourth, SA Perry did not retain
> Ms. Easley's personal effects for a prolonged period of time, as he searched each
> item briefly and immediately returned it to her.  Fifth the recording and testimony
> do not indicate that SA Perry blocked Ms. Easley's access to the aisle during the
> encounter.  Finally, the encounter occurred in the presence of other members of the
> public, namely, the other bus passengers.

United States v. Easley, 911 F.3d at 1079.    See United States v. Drayton, 536 U.S. at 204

(concluding that an encounter was consensual, because "[t]here was no application of force, no

intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking

of exits, no threat, no command, not even an authoritative tone of voice").

Here, the encounter between Johnson and Perry closely tracks the encounter in United

States v. Easley.  In this case, Perry walked to the bus' back to question passengers, while Chavez

remained at the bus' front.  Like in United States v. Easley, neither Perry nor Chavez brandished

a weapon.  Indeed, they were both dressed in plain clothes and both had their weapons concealed.

Perry addressed Johnson as "sir," repeatedly said "please" when making requests, and thanked

Johnson for his cooperation.  Perry also kept his voice low and used non-threatening language.

Additionally, Perry asked to see Johnson's ticket, but Perry did not keep Johnson's ticket in his

possession for a prolonged period.  Further, the encounter occurred on a Greyhound bus within

view of the other passengers.  As Garcia testified, the interior of the bus was confining.  While the

---

[8]Perry is the same agent in this case as in United States v. Easley.

"cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary," this single factor is not determinative. See Florida v. Bostick, 501 U.S. at 439. Finally, when Perry asked Johnson if he could search his bag, Johnson responded: "I am doing it." CD at 00:03:56-57. The Court views Johnson's response as tacitly consenting to the continued encounter. See United States v. Armando Martinez, 2019 WL 6127413, at *1 (describing the defendant's action of lowering his car window as "tacitly consent[ing]" to the continued law enforcement encounter). Importantly, before arresting Johnson, Perry did not change his behavior in any way that would indicate that Johnson was no longer free to terminate the encounter. See United States v. Easley, 911 F.3d at 1080 (observing that, "when we speak of a coercive environment, we mean an environment that is the creation of law enforcement conduct."

One factor distinguishing this case from United States v. Easley is that Perry briefly blocked Johnson's egress, effectively restraining Johnson's ability to leave for a period when he was conducting the "self-search" of his bag. Briefly blocking Johnson's ability to exit the bus alone does not convince the Court that Johnson was seized in the Fourth Amendment sense. There is no evidence that Johnson wanted to leave and could not, and only the "self-search" prompted Perry to move and look at the bag. Given Perry's tone of voice, his choice of words, his position next to the defendant, and that he did not brandish his weapon, the Court concludes that a reasonable person in Johnson's position would have felt free to terminate the encounter with Perry.

Johnson makes several arguments that do not persuade the Court to the contrary. First Johnson avers that a coercive environment existed, because Perry never informed him that he could terminate the encounter. See Motion at 13. The Supreme Court, however, has "expressly rejected [a] rule which made all police encounters non-consensual where officers failed to advise

individuals of their right not to comply with their requests." United States v. Armando Martinez, 2019 WL 6127413, at *6 (citing United States v. Drayton, 536 U.S. at 203). See United States v. Hernandez, 847 F.3d at 1264 ("Although no single factor is dispositive, the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred."). Perry's failure to so advise Johnson carries some weight in the Court's analysis, but not enough to tip the balance in this case given the presence of other factors discussed above.

Next, Johnson contends that Perry misled him when he overheard Perry telling other passengers that he was checking the bus for "security" reasons. Motion at 13. United States v. Easley rejected that argument, too. There, the Tenth Circuit rejected the district court's findings about Perry's misrepresentations, explaining that, even assuming Johnson had overheard Perry say he was searching the bus for security purposes, this statement "did not rise to a level of misrepresentation that would create a coercive environment." United States v. Easley, 911 F.3d at 1081.

Finally, Johnson implores the Court to consider the impact of Johnson's race on whether he felt free to terminate the encounter with Perry. See Motion at 17. Again, United States v. Easley forecloses this argument. There, the Tenth Circuit expressly rejected the consideration of race in the Fourth Amendment's objective reasonable person test; the Tenth Circuit explained that "[n]either [it] nor the Supreme Court has ever considered race a relevant factor in the Fourth Amendment context. Indeed, the Tenth Circuit has specifically disclaimed considerations that could inject the objective reasonable person analysis with subjective considerations." United States v. Easley, 911 F.3d at 1081. "In short, the categorical consideration of race in the reasonable person analysis is error." United States v. Easley, 911 F.3d. at 1082. Accordingly, the Court

rejects Johnson's contention that it should factor Johnson's race into its objective reasonableness

analysis.  The Court thus concludes that Perry did not seize Johnson before his arrest.

## II.  EVEN IF PERRY SEIZED JOHNSON, REASONABLE SUSPCISION SUPPORTED ANY INVESTIGATIVE DETENTION.

Johnson argues that, when Perry requested Johnson's permission to conduct a pat down, a

reasonable person would have felt that he could no longer terminate the encounter, and thus,

Johnson was seized.  See Motion at 17.  See also United States v. McGehee, 672 F.3d 860, 867

(10th Cir. 2012)("Because an investigatory detention must be justified at its inception, [the court]

must first pinpoint the moment when [the defendant] was seized.").  Thus, even assuming that a

seizure occurred at that time, Perry had reasonable suspicion to support the seizure.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent

conduct'; he or she simply must possess 'some minimal level of objective justification' for making

the stop." United States v. Winder, 557 F.3d at 1134 (quoting United States v. Vercher, 358 F.3d

1257, 1261 (10th Cir. 2004)).  Here, Perry had "a reasonable suspicion supported by articulable

facts that criminal activity 'may be afoot' . . . ." United States v. Sokolow, 490 U.S. at 7 (quoting

Terry v. Ohio, 392 U.S. at 30).  Indeed, when Perry requested to conduct a pat down of Johnson,

he already was suspicious of Johnson, and the Court will give "deference . . . to . . . a law

enforcement officer's ability to distinguish between innocent and suspicious actions." United

States v. Wood, 106 F.3d at 946.  Perry observed Johnson placing the bag underneath the seat next

to him, as opposed to under the seat in which he was sitting.  See FOF 9, at 5.  Perry believed this

action was Johnson's attempt to distance himself from the bag.  See FOF 28, at 6.  Then, when

Perry asked Johnson if he was traveling with luggage, Johnson repeatedly denied that he had

luggage.  "[L]ying to an officer is *not* consistent with innocent travel." United States v. Moore,

22 F.3d 241, 244 n.4 (10th Cir. 1994)(emphasis in original).  Additionally, Perry testified that, in his experience, drug traffickers often do not travel with identification, because they are traveling under a false name.  See Mar. 18 Tr. at 27:15-17; FOF 25, at 6.  Here, Johnson stated that he did not have identification.  See FOF 24, at 6.  These facts are sufficient to establish reasonable suspicion.  See United States v. Winder, 557 F.3d at 1134 ("Evidence falling 'considerably short' of a preponderance satisfies this standard.").  Thus, even assuming that Johnson was seized when Perry requested a pat down, the Court concludes that reasonable suspicion existed.

### III.  PERRY HAD PROBABLE CAUSE TO ARREST JOHNSON.

Probable cause requires a "substantial probability that a crime has been committed and that a specific individual committed a crime."  St. John v. Justman, 771 F.2d 445, 448 (10th Cir. 1985).  When Perry observed the black bundle in Johnson's bag, he had probable cause to arrest Johnson.  In addition to the factors discussed above which contributed to reasonable suspicion, before arresting Johnson, Perry became confident that Johnson was committing a crime.  For example, when Johnson finally admitted that the bag belonged to him, Johnson conducted a "self-search" and attempted to block Perry's view of the bag's contents.  Perry testified that, in his experience, individuals will conduct a "self-search" to attempt to conceal contraband while deflecting law enforcement's concerns.  See Mar. 18 Tr. at 38:9-14.  Then, when Perry finally saw the black bundle, he believed that the bundle contained illegal narcotics.  Perry based his belief on the bundle's size and shape, Johnson's concealment attempt, and Perry's twenty years of experience.  See Mar. 18 Tr. at 43:16-21; id. at 43:22-25; id. at 44:1-2.  Perry testified that he asked Johnson what the bundle was, and Johnson did not respond.  See Mar. 18 Tr. at 41:23-24.  Only following Johnson's failure to respond to Perry's inquiry did Perry arrest Johnson.  The Court concludes that

all these factors contributed to probable cause. The facts and circumstances within Perry's knowledge were sufficient to lead a prudent person to believe that Johnson was committing a crime. See Romero v. Fay, 45 F.3d at 1476.

## IV.    THE WARRANTLESS SEARCH OF JOHNSON'S BAG WAS VALID.

The warrantless search of Johnson's bag was valid. A warrantless search of a legally seized container is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement. See Flippo v. West Virginia, 528 U.S. 11, 13 (1999); United States v. Corral, 970 F.2d at 725. A warrantless search can be conducted if law enforcement agents see, within plain view, a container's contents, and it is apparent or a "foregone conclusion" that such contents are contraband. United States v. Corral, 970 F.2d at 725. "[W]here the police already possess knowledge approaching certainty as to the contents of the container, the search of the container does not unreasonably infringe upon the individual interest in preserving the privacy of those contents." United States v. Corral, 970 F.2d at 725-26.

In Johnson's Supplement and again in his Motion to Reconsider, Johnson argues that the bag's contents were not a foregone conclusion. See Supplement at 7-10; Motion to Reconsider at 4-7 Johnson points to Perry's questions: "What about inside this right here? Black bundle right there?" Johnson avers that, had Perry known the contents of the black bundle, he would not have asked. See Motion to Reconsider at 4.

The Court disagrees with Johnson's argument. Perry testified that, in his years of experience, he has seen drug traffickers hide narcotics inside clothing. See FOF 44, at 9. He specifically testified: "Well, I'd seen it on numerous occasions. People with bundles of illegal narcotics inside sleeves, jackets, pants, shirts, underwear. Basically the shape, the size, the

concealment method. And then all his actions that came before this, I believed that was a bundle of illegal narcotics." Tr. at 41:14-20. The Court concludes that, under such circumstances, it was a foregone conclusion that the black bulge contained drugs.[9] As a consequence, the plain-view exception applies to the search of Johnson's bag following his arrest. See, e.g., United States v. Jackson, 381 F.3d 984, 989 (10th Cir. 2004)(holding that, under similar circumstances, DEA agent's warrantless search of a baby powder container fell within the plain-view exception, because "it was a foregone conclusion that the baby powder container held drugs"). The Court concludes that the search was valid.

IT IS ORDERED that: (i) the requests in the Defendant's Supplement, filed April 5, 2019 (Doc. 55), are denied; and (ii) and the Defendant's Motion to Reconsider, filed November 4, 2019 (Doc. 79), is granted in part and denied in part. The Court has carefully considered its order, filed July 30, 2019 (Doc. 68), but has come to the same conclusion that the Defendant's Motion to Suppress Evidence, filed February 4, 2019 (Doc. 31), should be denied.

_____
UNITED STATES DISTRICT JUDGE

---

[9]Johnson notes that Perry testified that he did not know definitely whether the black bundle contained drugs. Case law does not require absolute certainty, but only "knowledge approaching certainty," United States v. Corral, 970 F.2d at 725-26, which the Court concludes Perry had.

*Counsel*:

John C. Anderson
  United States Attorney
Mark Christian Pfizenmayer
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Benjamin A. Gonzales
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

      *Attorneys for the Defendant*